Filed 1/7/22  P. v. Munoz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RODRIGO MUNOZ,<br><br>Defendant and Appellant. | H048181<br>(Santa Cruz County<br>Super. Ct. No. 17CR02586) |

A jury convicted defendant Rodrigo Munoz of forcible rape.  He argues the trial court committed reversable error when it failed to instruct the jury on mistaken consent. He also argues that counsel rendered ineffective assistance by failing to request the mistaken consent instruction, and that counsel was separately ineffective for not requesting an instruction regarding good character evidence.  Finding no trial court error and no prejudicial deficiency in counsel's performance, we will affirm the judgment.

## I.  BACKGROUND

Jane Doe reported in 2016 that defendant forced her to have sexual intercourse in 2012 when they were both 19 years old.  Officers recorded a lengthy pretext call Doe made to defendant, and in 2017 he was charged with forcible rape (Pen. Code, § 261, subd. (a)(2); count 1) and forcible sodomy (Pen. Code, § 286, subd. (c)(2); count 2). Trial was held in 2020.  Defendant was found guilty of forcible rape and not guilty of forcible sodomy.  He was sentenced to a three-year prison term.

According to evidence at trial, defendant and Doe met in late 2009, when they were 17 years old. Defendant lived with his family, and Doe lived with her parents in a nearby town. Both were raised in the Jehovah's Witnesses faith, which disapproved of premarital sexual intimacy and encouraged chaperoned dating. Doe was a baptized member of the religion; defendant was not. In 2010, defendant contacted Doe through social media and in 2011 they started a relationship. Doe's and defendant's recollections of the relationship diverge at that point, and they testified to vastly different accounts of their relationship before, during, and after the 2012 rape.

*Doe's Version of Events*

Doe described the relationship before having intercourse as being "boyfriend" and "girlfriend," talking to each other romantically, but not being "intimate." She and defendant did not "date." They spent time in groups, were alone in a mall once or twice, and held hands and kissed once in 2012. She never "made out" with defendant or took off her clothes. Defendant knew that Doe adhered to her faith. Defendant was possessive and did not want her "talking to anybody, [] especially guys." At one point he asked if she wanted to have sex, which he knew was not something she would do as a baptized Jehovah's Witness, and she told him no. Around April or May 2012 she told him she did not want to talk anymore. She attended his high school graduation in June 2012 because she way trying to be a good friend, but they were no longer "talking romantically."

After not seeing each other for a month, defendant came to Doe's home unannounced on July 3, 2012, and had forced, nonconsensual intercourse with Doe. She had nonconsensual sex with him four or five more times in July, although those times she did not resist him physically and "let it happen." One of those instances involved anal penetration. She confessed to a church elder at the end of July that she had sex one time, and she was censured by a committee of church elders. After the elders learned from

2

defendant's church elders that the two had engaged in intercourse multiple times, Doe was "disfellowshipped" for lying.

Doe resumed a relationship with defendant in the fall of 2012, and they had intercourse a few more times before Doe again ended the relationship because "all he wanted" was sex. He "left her alone completely" when she told him she had a problem with what he was doing, and warned if he contacted her again, she would go to the police with "proof of everything." She later found out she was pregnant with defendant's child, delivered a premature baby girl in May 2013, and resumed a relationship with defendant for the sake of their child. She felt like her plans for the future had been ruined, she had disappointed her parents, and "the only thing [she] could do was just stay with him, or try, for [the child], not for [her]." When she brought up the July 3 incident, defendant told her to "forget it" and "get over it" because "things are different" now that they had a daughter. She tried to "get over it," but defendant was sexually aggressive and possessive, and she again ended the relationship in 2014.

Doe described instances of defendant stalking her in 2015, including messaging things like " 'I know you're not home. Where are you?' " and " 'Confess your sins … or I'll do it.' " In late 2015 she reported defendant's stalking behavior to the police, but did not mention the 2012 rape because "it had been a while back," and she "didn't know there was anything that could be done." She applied for a domestic violence restraining order in November 2015, in which she stated "On July 3rd, 2012 … he sexually abused of me (*sic*), I was in a fragile situation and he took advantage of me and forced me into it."

In April 2016, Doe and defendant attended the same social function, where defendant told Doe she was "going to pay" for what she was doing, he was " 'going to hit [her] where it will hurt [her] the most,' " and she was " 'going to regret it.' " That is when she decided to report the rape. Around that time, she told her parents everything that had happened, and the two families met. Doe's father confronted defendant about

3

raping Doe. Defendant stayed quiet and did not deny it. Child support was not discussed at that meeting. Doe was unaware of any child support action at that time, and she did not threaten to report the rape if defendant refused to drop the support case.

*Defendant's Version of Events*

Defendant testified that once he and Doe started dating, they went to the movies two or three times a week, where their sexual intimacy progressed from kissing to digital vaginal penetration. Later they spent time in vehicles where they undressed and engaged in penile vaginal contact. During one of those instances, Doe asked defendant whether he had a condom, which shocked him. They sent love letters to each other. Letters were admitted in evidence from the first half of 2012 in which Doe expressed her love for defendant and her desire to marry him.

The first time defendant and Doe had sexual intercourse was June 5, 2012, their one-year anniversary. (We note that defendant assigned an earlier date to the charged events than recounted by Doe, who described them as occurring on July 3, 2012. However both Doe and defendant described the incident as taking place in Doe's apartment and as the first time she had ever had intercourse. We perceive no ambiguity in the record arising from the date discrepancy, and defendant has not raised the issue on appeal.) Defendant testified the sex was consensual, and Doe provided a condom. They continued having consensual intercourse into August, at which time they agreed to "break [their] relationship" in order to "fix [their] relationship with God" by "confessing their sins" to their respective church elders. After righting themselves with their churches, they would "start dating legit." At one point they had sex in Doe's father's truck "doggie style," and defendant accidently penetrated Doe's anus. It was dark, she pulled away, he apologized, they hugged, got dressed, and talked about their relationship. Doe wanted to tell their parents they were still having sex and were going to run away. Defendant told her he had just started working and did not have money saved. Doe was furious that defendant would not speak to her parents, defendant realized he had fallen short of her

4

expectations, and their relationship ended. But they had more sex later that year in October and November.

Doe contacted defendant after their daughter was born. They "kept seeing each other" after defendant met his daughter, and his relationship with Doe "progressed" to being "together" again. Text messages from May and June 2014 show the two in an amorous relationship, with Doe expressing her love for defendant. The relationship ended when Doe no longer wanted to accept money from him. Defendant maintained weekly visits with his daughter for a year or two, but Doe's family started to make visiting more difficult, and defendant saw his daughter less and less.

In April 2016, defendant had not seen his daughter in several months. He told Doe he was going to file a child support application, but he was still in love with her and wanted to work things out informally. About the same time, defendant attended a social function where Doe's mother would not let him dance with his daughter. Defendant became upset and told Doe that she was "going to pay" for that. On April 17, he filed an application to determine child support (which he understood as a means "to have more custody" with his daughter), and the county opened a support case on May 3. Doe phoned him upset about the application, and Doe's father convened a meeting. Doe and her father accused defendant of "taking [Doe] at force" and defendant was shocked. They discussed the DNA testing required to establish paternity, and the amount of child support Doe would receive. Doe and her father asked defendant to drop the child support case, and Doe threatened to report that he forced her to have sex if he continued with the application. Defendant's parents testified that Doe and her father wanted defendant to withdraw the child support case, and Doe said she would claim defendant abused her if he did not comply.

5

## II. DISCUSSION

### A. MISTAKEN CONSENT DEFENSE

Defendant argues substantial evidence supported a mistaken consent defense, and the trial court committed prejudicial error by failing sua sponte to instruct the jury on the defense.

Our Supreme Court in *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*) held that a defendant who holds a reasonable and bona fide belief that a victim voluntarily consented to asportation and sexual contact does not have the wrongful intent necessary to be convicted of kidnapping and rape. (*Id.* at p. 155.) The court later described a *Mayberry* defense as having both a subjective and an objective component. (*People v. Williams* (1992) 4 Cal.4th 354, 360 (*Williams*).) The subjective component is satisfied where the defendant "adduce[s] evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent." (*Id.* at p. 361.) The objective component is satisfied where the defendant's belief regarding consent was formed in circumstances society will tolerate as reasonable. (*Ibid.*)

When warranted by the evidence, a trial court has a sua sponte duty to give a mistaken consent instruction. (*Mayberry*, *supra*, 15 Cal.3d at pp. 156–157.) Specifically, the instruction must be given when there is "substantial evidence of equivocal conduct [on the part of the victim] that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Williams*, *supra*, 4 Cal.4th at p. 361; *People v. Salas* (2006) 37 Cal.4th 967, 982 ["a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence"].) Conversely, there is no basis for the instruction where "the only evidence from the defendant is unequivocal consent and from the victim nonconsensual forcible sex." (*People v. May* (1989) 213 Cal.App.3d 118, 125 (*May*).) Substantial evidence to support the instruction exists where the evidence " 'if believed by the jury, [is] sufficient to raise a reasonable doubt' " as to guilt. (*Salas*, at p. 982.) On

6

appeal, a reviewing court considers the evidence in the light most favorable to the appellant. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.)

The evidence in *Mayberry* warranted mistaken consent instructions for kidnapping and rape because Mayberry's testimony "could be viewed as indicating that he reasonably and in good faith believed that [the victim] consented to accompany him to the apartment and to the subsequent intercourse," and the victim also testified to equivocal behavior on her part. (*Mayberry*, *supra*, 15 Cal.3d at p. 156.) Mayberry testified that he saw the victim; engaged her in conversation; accompanied her to the grocery store and to a store where she purchased cigarettes; and she accompanied him willingly to his home where they had consensual sex. (*Id*. at p. 149.) The victim testified that Mayberry, whom she did not know, approached her on the street as she was walking to the grocery store. (*Id*. at p. 147.) He accosted her and shouted obscenities. (*Ibid*.) He then confronted her in the store, told her she was going to go outside with him, and she would " 'pay for it' " if she did not cooperate. (*Ibid*.) She left with him because she was confused and scared and did not see a store security guard. (*Ibid*.) They spent several minutes outside the store before walking to another store where, after buying cigarettes, the victim " 'put on an act' " and tried " 'to fool' " Mayberry to facilitate an escape. (*Id*. at pp. 147–148.) She " 'tried to talk him out of it' " as they sat on a curb, after which she walked with him several blocks to his apartment without resisting. (*Id*. at p. 148.) After 15 minutes in Mayberry's apartment during which she unsuccessfully tried to persuade him to change his mind, Mayberry had sex with her without her consent. (*Ibid*.) The Supreme Court explained that the victim's " 'act' and admitted failure physically to resist him after the initial encounter or to attempt to escape or obtain help might have misled him as to whether she was consenting." (*Id*. at p. 156.)

The evidence also supported a mistaken consent instruction in *May*. The victim and May met in a bar, drank together, left together, went to two more bars where they continued drinking, and then went to an apartment May shared with his father, where

7

they engaged in oral sex. (*May*, *supra*, 213 Cal.App.3d at pp. 122–123.) The victim testified that she felt an attraction to May when she left the first bar with him. (*Id*. at p. 122.) When they arrived at his apartment, May told her to go to the bedroom and disrobe. She followed him to the kitchen where she wielded a knife and told him "no." May took the knife from her hand, slapped her face, and led her to the bedroom where she disrobed and complied with his sex demands because she felt she had no choice. (*Id*. at p. 123.) She dressed and left the apartment when May left the bedroom to take a phone call. (*Ibid*.) May testified that they left the bar together because the victim offered him sex for money; they drank and flirted with each other for several hours; and she became upset when he refused to pay her for the sex. (*Id*. at pp. 123–125.) May's father testified that May and the victim entered the apartment holding hands and whispering; the two drank a beer in the kitchen; the victim led May to the bedroom where they spent 15 or 20 minutes and exited together; and the father neither saw nor heard anything unusual. (*Id*. at p. 124.)

Substantial evidence in that case would have permitted a jury to find that May had a good faith, albeit mistaken, belief that the victim had consented to the sexual acts. The victim willingly accompanied May to the apartment after "several hours of merriment," she failed to leave the apartment when May told her to go to his bedroom, she did not verbally object while in the bedroom, and an inference could be drawn from the testimony of May's father that the victim had willingly participated in the sexual encounter. (*May*, *supra*, 213 Cal.App.3d at p. 126.)

In contrast to *Mayberry* and *May*, the evidence in *Williams* did not support a mistaken consent instruction. (*Williams*, *supra*, 4 Cal.4th at pp. 365–366.) The defendant and victim in *Williams* met at a homeless shelter in San Francisco. (*Id*. at p. 357.) Williams invited the victim for coffee " 'with no strings attached,' " and they spent the morning walking and conversing. (*Ibid*.) The victim testified that Williams asked her if she would like to watch television, and she thought he was inviting her to a

8

friend's house. She did not think he was suggesting sex because he had told her he had a daughter about her age. (*Ibid*.) They entered a building where Williams rented a room and Williams asked the clerk for a sheet, at which point the victim realized they were in a hotel. (*Ibid*.) The victim testified the sexual encounter occurred only after Williams blocked her attempt to leave the room, punched her in the eye, pushed her onto the bed, ordered her to take off her clothes, and told her he did not like to hurt people. (*Id*. at p. 362.) Williams testified that the victim initiated the sexual contact in the hotel room, fondled Williams to overcome his impotence, and inserted his penis into her vagina. (*Ibid*.) The *Williams* court observed "if 'defense evidence is unequivocal consent and the prosecution's evidence is of non-consensual forcible sex the [*Mayberry*] instruction should not be given,' " and the "wholly divergent accounts create no middle ground from which Williams could argue he reasonably misinterpreted [the victim]'s conduct." (*Id*. at p. 362.) Williams's testimony that the victim fondled him and inserted his penis inside her, if believed, established actual consent. (*Ibid*.) The victim's testimony—that she was blocked from leaving the room, punched, pushed on the bed, ordered to undress, and threatened—would preclude any reasonable belief in consent. (*Ibid*.)

We find the testimony here distinguishable from *Mayberry* and *May*, and analogous to *Williams*. Defendant described the encounter as Doe providing unequivocal consent: Defendant testified that he contacted Doe as he approached her apartment; she opened the door; they embraced; briefly talked; and started "making out" on the sofa. After 30 seconds or a minute, Doe gave defendant an inviting "little look" and they together moved from the sofa to the bed as they continued kissing. They both undressed; they started "doing first just the tip"; Doe retrieved a condom from the windowsill and offered to put it on defendant's penis. Defendant was embarrassed and nervous; he knew it was Doe's first time; and he put the condom on himself. The intercourse started with her on top, but her legs started to shake so they switched positions. They had brief intercourse with him on top, until she asked him to stop, at which time he "pulled away"

9

and they started cuddling.  She did not push him away or cry, and he did not use force.  The prosecutor asked defendant in his mind how many seconds of unwanted sex would amount to rape.  Defendant responded, "It never happened, so how would I know."

Doe testified that the sex was forced and without her consent.  Defendant came to her apartment unannounced and was aware of her views against premarital sex.  She opened the door because she thought it was one of her parents who had just left for work, and she was surprised to see defendant.  He said he wanted to talk, came inside, and told her he loved her.  He "started to get too close," she "got up," he "cornered" her and started kissing her in a forceful way.  She kissed him back at first, thinking it would calm him down.  But it didn't and she stopped responding to the kissing.  Defendant grabbed her and pushed her onto the bed.  "And he just went on top of me, and I was pushing him and was telling him to stop, but he didn't."  He "started grabbing [her] hand" and tried to pull down her pajamas, and she "was fighting through the whole time."  She "was telling him to stop" and "asking him, '[w]hat are you doing?' "  He did not answer.  He held her hands and pulled down her pants and forced himself into her.  At that point she stopped moving and was "just crying and crying," and "he just kept going until he stopped."  Afterwards, he hugged her and said he was sorry.

In *Mayberry*, the victim herself offered evidence of equivocal conduct.  She put on an act to fool Mayberry in public, and did not attempt to flee or seek help as she walked with him.  (*Mayberry*, *supra*, 15 Cal.3d at p. 156.)  In *May* both the victim and the defendant's father offered evidence of equivocal conduct.  The victim acknowledged that wielding a knife instead of leaving could have been viewed by May as joking, and May's father's testimony supported an inference that the victim behaved as if she were a willing participant in the sexual encounter.  (*May*, *supra*, 213 Cal.App.3d at p. 126.)  In contrast here there was no substantial evidence of equivocal conduct which defendant could have reasonably mistaken for consenting to intercourse.  If believed, defendant's testimony— that he and Doe "made out," moved to the bed and undressed together, and that Doe

10

provided and offered to apply a condom—would establish actual consent. If believed, Doe's account—that after kissing defendant she physically and verbally resisted as he pinned down her arms and pulled down her pants—would preclude any reasonable belief of consent. As in *Williams*, the "wholly divergent accounts create no middle ground from which [defendant] could argue he reasonably misinterpreted [Doe's] conduct." (*Williams*, *supra*, 4 Cal.4th at p. 362.)

Defendant argues substantial evidence supports a mistaken consent instruction because after he arrived at Doe's apartment, she kissed him and "acquiesced when he did other things"; he could have reasonably misinterpreted Doe's "look" to mean a desire to have sex; he and Doe agree that she told him to stop; and "[a] reasonable juror could have concluded that [he] did stop more or less immediately, though it might have seemed longer to Doe." We acknowledge Doe's testimony that she initially "kiss[ed] him back." But in light of all the testimony, that is not sufficient evidence of equivocal consent to sexual intercourse. Doe testified that she stopped kissing defendant and actively resisted him both verbally and physically up to the moment he penetrated her, at which time she started to cry. Had the jury believed defendant's testimony that he "pulled away" as soon as Doe asked him to stop, it would have necessarily rejected Doe's testimony about actively resisting and it would have returned a not guilty verdict. Crediting defendant's version of the events leads to a defense of *actual* consent, not mistaken consent.

Although a jury is entitled to accept some portions of a witness's testimony and reject others (CALCRIM No. 226; *People v. Wickersham* (1982) 32 Cal.3d 307, 328), defendant has not shown a "middle ground" on which to argue he reasonably misinterpreted Doe's conduct. Their completely disparate accounts present questions of credibility, not evidence of mistake.

We agree that a defendant's state of mind is often shown through circumstantial evidence, which may prevail over even the defendant's own testimony. (*May*, *supra*, 213 Cal.App.3d at p. 127.) Defendant points to Doe's "motive to minimize her role and

11

shift blame" to preserve her standing with her family and church. But this too is a challenge to Doe's credibility, not circumstantial evidence of her equivocation. Even if the jury believed that Doe and defendant had done "more than kiss" before the charged incident; that Doe and defendant had frequent consensual sex after the incident; that Doe wanted more from the relationship than defendant was able to give; and that Doe's decision to report the rape was motivated by defendant's decision to assert his parental rights, none of that evidence establishes mistake on the date in question. Nor does the 36-minute pretext call provide a basis for mistaken consent. At times in the call defendant appears to acknowledge forcing himself on Doe; at other times he takes the position that he stopped when Doe asked him to stop. At the beginning of the call defendant responded, "are you really serious about that?" when Doe told him she was thinking about reporting "what happened in 2012 when everything started, when, um, you forced me to have relations with you." Defendant replied with, "It didn't even last 10 seconds," and insisted that he pulled away when Doe "pushed me … [and] said stop three times." Never on the lengthy call did he or Doe suggest that he had misunderstood some act or conduct on Doe's part as consent.

For the reasons we have explained, we find no trial court error or due process violation in not giving a mistaken consent instruction. We therefore also reject defendant's alternative argument that trial counsel was constitutionally ineffective for failing to request the instruction.

## B. CHARACTER DEFENSE INSTRUCTION

Defendant argues trial counsel was ineffective for not requesting CALCRIM No. 350 regarding evidence introduced about a defendant's character.[1] According to

---

[1] CALCRIM No. 350 provides, "You have heard character testimony that the defendant (is a <insert character trait relevant to crime[s] committed> person/ [or] has a good reputation for <insert character trait relevant to crime[s] committed> in the community where (he/she) lives or works). [¶] Evidence of the defendant's character for <insert character trait relevant to crime[s] committed> can by itself create a reasonable

12

defendant, the instruction was necessary because the prosecution introduced evidence of his stalking Doe and having unwanted sex with her, and the jury was instructed on evidence of uncharged domestic violence, uncharged forcible rape, and uncharged forcible sodomy to show that he was "disposed or inclined" or "likely" to commit the charged offenses. (Evid. Code, §§ 1108, 1109.) Defendant presented one character witness, a woman he dated and with whom he had sex around the time he first had sex with Doe; she testified that defendant had a character for nonviolence. The jury was not instructed on how to use character evidence in particular.

Ineffective assistance requires a showing that counsel's performance was deficient, and the defendant was prejudiced by the deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Even if counsel should have requested the instruction, we see no resulting prejudice based on the instructions as given. To prove prejudice, a defendant must affirmatively show a reasonable probability of a more favorable result but for trial counsel's errors. (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.) Defendant's character witness testified that she had a three-year relationship with defendant which started when she was 15 and defendant was 17. Their families were close and had known each other since she was small. She was sexually intimate with defendant throughout the relationship and had

_____

doubt [whether the defendant committed <insert name[s] of alleged offenses[s] and count[s], e.g., battery, as charged in Count 1>]. However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] [If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.] [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt." (CALCRIM No. 350.)

sexual intercourse with him. In her opinion, defendant had a character and reputation for nonviolence.

The jury was instructed to "impartially compare and consider all the evidence that was received throughout the entire trial" and to "decide whether a fact in issue had been proved based on all the evidence." The character evidence was not so complex that the jurors would have difficulty assessing the information and relating it to the disputed issues in the case. In closing argument, trial counsel contrasted the former girlfriend's testimony—that she and defendant were sexually active for three years and defendant had a reputation for nonviolence—with Doe's testimony that she and defendant were actively involved in a dispute over their daughter and that he was "the most violent person in the world." Nothing prevented jurors from giving the good character evidence all the weight they believed was appropriate. Even crediting the former girlfriend's testimony, it did not impeach Doe's testimony as to the charged incident, which was corroborated by evidence of her demeanor at work the morning of the assault, her statement to a friend later that week, and statements made by defendant in the pretext phone call.

## C. CUMULATIVE PREJUDICE

As we have explained, the trial court was not required to give a mistaken consent instruction, and we see no prejudice resulting from the instructions as given. We therefore reject defendant's argument that the cumulative impact of individual errors deprived him of a fair trial under the federal Constitution. Our examination of the entire record shows no miscarriage of justice (Cal. Const., art. VI, § 13) or due process violation.

## III. DISPOSITION

The judgment is affirmed.

_____

Grover, Acting P.J.

**WE CONCUR:**


_____

Lie, J.


_____

Wilson, J.


H048181 - *The People v. Munoz*